**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **MARIE SEIDE** | **Civil Action** |
| Plaintiff, | |
| | **Case Number:** |
| vs. | 6:09-cv-1306-ORL-35KRS |
| **TRIANGLE MANAGEMENT &** | |
| **INVESTMENT CORP., d/b/a** | |
| **TRIANGLE HOSPITALITY GROUP** | **JURY TRIAL DEMANDED** |
| *a Florida profit corporation,* | |
| **ATLANTIC HOSPITALITY OF** | |
| **FLORIDA LLC, d/b/a CLARION** | |
| **RESORT,** *a Florida profit company,* | |
| **MAZEL INVESTMENTS, LLC d/b/a** | |
| **HOWARD JOHNSON, HOLLYWOOD** | |
| **INN & SUITES** *a Florida profit* | |
| *company* | |
| | |
| **TRINET GROUP, INC.,** *a foreign profit* | |
| *corporation, formerly known as* | |
| **GEVITY HR, INC.** *a Florida profit* | |
| *corporation, and* | |
| | |
| **MARCOS FINTZ** *individually,* | |
| | |
| Defendants | |
| _____/ | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, MARIE SEIDE (hereinafter referred to as "Plaintiff" or "Ms.

Seide"), by and through undersigned counsel, pursuant to the Federal Rules of Civil

Procedure, files this Complaint and Demand for Jury Trial and hereby sues TRIANGLE

MANAGEMENT & INVESTMENTS CORP. d/b/a TRIANGLE HOSPITALITY

GROUP, ATLANTIC HOSPITALITY OF FLORIDA LLC d/b/a CLARION RESORT,

MAZEL INVESTMENTS, LLC d/b/a HOWARD JOHNSON HOLLYWOOD INN &

SUITES, TRINET GROUP, INC., formerly known as GEVITY HR, INC., and MARCOS FINTZ, Defendants, and states as follows:

<b><u>JURISDICTION AND VENUE</u></b>

1.      This is a civil action seeking monetary damages and affirmative relief based upon Defendants' violation of Title VII of the Civil Rights Act of 1964, as amended by *inter alia*, the Civil Rights Act of 1991, 42 U.S.C. §2000e *et seq*. ("Title VII"), the Florida Civil Rights Act, Chapter 760.10, *et. seq*. ("FCRA") and Florida common law claims of battery, false imprisonment and intentional infliction of emotional distress.

2.      Plaintiff seeks to recover back wages, front wages, compensatory and punitive damages, pre and post judgment interest, taxable and non-taxable costs and attorneys' fees against the Defendants for sexual harassment in violation of Title VII and the FCRA and damages in connection with Florida common law claims of battery, false imprisonment and intentional infliction of emotional distress.

3.      Jurisdiction of this Court over this controversy is invoked under 28 U.S.C. §1331 and 28 U.S.C. §§1343(3) and (4).

4.      In addition, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's state common law claim because such claims are derived from a common nucleus of operative facts.

5.      This Court is empowered to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

6.      The Middle District of Florida has personal jurisdiction over Defendants because they do business and are doing business in Florida, and in this district, and because many of the acts complained of occurred in this State, within this District, and gave rise to the claims alleged.

7.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because the Defendants are believed to "reside" in this District and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

8.      Plaintiff, Marie Seide, is and was, during her employment with Defendants, a citizen and resident of Osceola County, Florida and within the jurisdiction of this Court.

9.      Pursuant to Local Rule 1.02(b) of the Local Rules for the United States District Court for the Middle District of Florida, assignment to the Orlando Division is proper because a substantial part of the events giving rise to claims presented in this Complaint occurred in or around Kissimmee, Osceola County, Florida.

**PARTIES**

10.      Triangle Management & Investment Corp., d/b/a Triangle Hospitality Group ("THG") is a Florida profit corporation with its principal place of business at 2847 Hollywood Blvd. Hollywood, Florida 33020 and owns, operates and manages hotel properties including the CLARION RESORT WATERPARK ("CRW"), at Irlo Bronson Highway, Kissimmee, Florida, is engaged in an industry affecting commerce and at all times material to this lawsuit, was Plaintiff's employer.

3

11. Atlantic Hospitality of Florida, LLC ("Atlantic") d/b/a Clarion Resort is a Florida limited liability company with its principal place of business at 2261 Irlo Bronson Memorial Hwy, Kissimmee, Florida 34722, and owns, manages and operates a hotel property, the CLARION RESORT WATERPARK, ("CRW"), at Orlo Bronson Highway, Kissimmee, Florida, is engaged in an industry affecting commerce and at all times material to this lawsuit was Plaintiff's employer.

12. Mazel Investments, LLC d/b/a Howard Johnson Kissimmee Heritage Park Resort ("Mazel") is a Florida limited liability company with its principal place of business at Irlo Bronson Memorial Hwy, Kissimmee, Florida 34722, and owns, manages and operates a Howard Johnson hotel property at Irlo Bronson Hwy, Kissimmee, Florida, is engaged in an industry affecting commerce and upon information and belief, at all time material to this lawsuit was Plaintiff's employer.

13. TriNet Group Inc. ("TriNet") recently acquired Florida profit corporation, Gevity HR, Inc. ("Gevity") and is a foreign profit corporation. Gevity HR, Inc. is/was, during Plaintiff's employment, a Florida profit corporation with its principal place of business at 9000 Town Center Parkway, Bradenton, Florida 34202. TriNet/Gevity is a professional employer organization ("PEO") and engages in an industry affecting commerce and at all time material to this lawsuit was Plaintiff's employer. TriNet/Gevity provides administrative and Human Resources services to Triangle Management & Investment Corp., Atlantic Hospitality of Florida, LLC, Mazel Investments, LLC and Marcos Fintz, including, but not limited to, purported investigation and remedial action of employment related claims including, but not limited to, claims of sexual harassment.

4

14.    Marcos Fintz ("Mr. Fintz") is an individual who owns, operates and manages Triangle Management & Investments Corp. Atlantic Hospitality of Florida LLC, and Mazel Investments, LLC and is a resident and domiciliary of Broward County, Florida and, at all times material to this lawsuit, had authority to control the terms and conditions of Plaintiff's employment as well as the employment of all employees of Triangle, Atlantic and Mazel.

15.    Triangle, Atlantic, Mazel and Gevity (hereinafter referred to as "Corporate Defendants") each has employed twenty or more employees for each working day in each of the twenty or more calendar weeks in the current or proceeding year. Corporate Defendants are each an "employer" as defined and required by Title VII of the Civil Rights Act of 1964, as amended, the Florida Civil Rights Act.

16.    Plaintiff is a former employee of Defendants and, at all times material hereto, was a resident and domiciliary of Osceola County, Florida.

<b><u>CONDITIONS PRECEDENT</u></b>

17.    On March 19, 2009, Plaintiff timely filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR") copies of which are attached hereto as **Composite Exhibit A.**

18.    Plaintiff received Notices of her Right to Sue from the EEOC on April 30, 2009 and has timely filed the instant action within ninety (90) days of receipt of the Notice of Right to Sue attached hereto as **Composite Exhibit B.**

19.    Plaintiff has met all conditions precedent to the filing of this lawsuit.

5

## GENERAL ALLEGATIONS

20.     Plaintiff, Marie Seide (female) began her employment with Corporate Defendants on August 17, 2006 as a Front Desk Clerk at the Clarion Resort Waterpark ("CRW") in Kissimmee, Florida.

21.     On September 20, 2006, within a month of her date of hire, Plaintiff was promoted to the position of Catering Coordinator for THG/CRW.

22.     As Catering Coordinator, Plaintiff typically worked in excess of sixty five (65) hours per week, but was paid only a fraction of the overtime compensation she earned for the hours she worked in excess of forty (40) hours in a workweek.

23.     Plaintiff remained the Catering Coordinator for eight (8) months and continued to work, on average, sixty five (65) hours per week without being compensated for all overtime hours worked.

24.     In May 2007, Plaintiff was transferred to the position of Front Desk "Manager" for CRW and another hotel property, the Howard Johnson Kissimmee Heritage Park Resort owned and operated by Mazel and Marcos Fintz.

25.     In May 2007 when Plaintiff became Front Desk "Manager," Defendants told Plaintiff she was getting too much "overtime" pay. THG/CRW management then changed her status from non-exempt "hourly" to exempt "salaried" to avoid paying her overtime compensation for the hours she worked in excess of forty (40) in a workweek.

6

26. As the Front Desk "Manager" for both properties, Plaintiff worked fifteen (15) to sixteen (16) hours per day, seven (7) days per week, to complete her tasks and ensure that both properties had adequate front desk coverage.

27. The vast majority of Plaintiff's duties as Front Desk "Manager" were not related to management functions.

28. Most of Plaintiff's duties consisted of production work, were non-managerial in nature and would not qualify her for "exempt" status.

29. Based on the duties of her position, Plaintiff did not qualify for an exemption, should not have been classified as an "exempt" employee and should have received overtime compensation for all hours she worked in excess of forty (40) in a workweek pursuant to the FLSA.

30. THG/CRW and Marcos Fintz intentionally misclassified Plaintiff as "exempt" from overtime and failing to pay Plaintiff overtime for all hours she worked over forty (40) in a workweek while in the position of Front Desk "Manager."

31. In July 2008, Plaintiff was again transferred to a position entitled Human Resources "Manager."

32. Her duties as Human Resources "Manager" included completing new hire paperwork, maintaining employee files, covering the front desk for 4 to 5 shifts per week, room inspections, guest service, guest complaints, maintenance scheduling, sending reports to the owner and taking minutes at manager's meetings.

33. Plaintiff's tasks as Human Resources "Manager" were mostly non-managerial in nature and did not qualify for an exemption.

34.    As Human Resources "Manager," Plaintiff worked approximately fifty (50) hours per week, was misclassified as "exempt" and was paid a salary and did not receive compensation for any hours she worked over forty (40) in a workweek.

35.    In May 2007, Plaintiff complained to THG/CWR management about not receiving "overtime" pay for the hours she worked over 40 in a workweek.

36.    Plaintiff complained to THG/CRW management several times during the time period she worked as Front Desk "Manager" when she typically worked over one hundred (100) hours per week without receiving any overtime compensation.

37.    Despite Plaintiff's complaints, THG/CRW continued to deny Plaintiff any overtime compensation for the hours she worked in excess of forty (40) hours per week.

## SEXUAL HARASSMENT AND CONSTUCTIVE DISCHARGE

38.    Plaintiff was "constructively discharged" from her employment with Defendants on January 19, 2009, following a series of sexually harassing incidents by THG/CRW owner, Marcos Fintz, in January 2009.

39.    Marcos Fintz is the owner and operator of THG/CRW, Atlantic and Mazel and each week visits the hotel properties at which Plaintiff worked.

40.    During Fintz' property visits, usually mid-week, he stays overnight and works with THG/CRW employees regarding resort operations, revenue and other business issues.

41.    On January 13, 2009, Marcos Fintz was visiting the property when CRW General Manager, in the presence of Fintz and a co-worker, demanded that Plaintiff take Fintz out to lunch.

42.    Plaintiff did not feel comfortable taking Fintz to lunch but did not want to act insubordinate toward him or the General Manager by refusing. Plaintiff drove Fintz to a nearby restaurant to have lunch.

43.    During lunch, Fintz made inappropriate sexual comments to Plaintiff that made her very uncomfortable.

44.    While Plaintiff was driving Fintz from lunch back to the property, he made numerous inappropriate sexual comments, including but not limited to, asking Plaintiff what she was wearing under her skirt, whether she used special tanning lotion on her legs, telling her she had beautiful skin and telling her how "pretty" she was.

45.    Fintz also put his hand on Plaintiff's upper leg/thigh, caressed her thigh and commented that the skin on her leg felt "smooth."  The entire ride back to the property consisted of Fintz making unwelcome sexual advances toward Plaintiff and making her extremely uncomfortable.

46.    When Plaintiff arrived back at the property she immediately attempted to contact the General Manager to tell him what had happened but could not reach him.

47.    At approximately 3:00 p.m., Fintz approached Plaintiff near the reservation desk, gave her some chocolate candy and told her he needed to speak with her more about business later that day.

48.    Fintz instructed Plaintiff to contact him before she left the property that day because he needed to speak with her "about business."

9

49.    Plaintiff spoke with the General Manager at approximately 4:00 p.m. and explained what had happened with Fintz during and after lunch and told him that Fintz instructed her to contact him before she left work that day.

50.    The General Manager apologized to Plaintiff but could not take any action to protect Plaintiff because Fintz was the owner of the hotel, his boss and could easily terminate his employment.

51.    At around 5:20 p.m., Plaintiff left the property to pick up her children and take them home. While Plaintiff was driving, Fintz contacted her on her cellular phone and questioned where she was.

52.    Plaintiff informed Fintz she was picking up her children and taking them home for the day. Fintz demanded she immediately turn around and come back to the property.

53.    Fearing for her job, Plaintiff explained that she had to pick up her children at day care and that she could not just turn around and come back.

54.    Fintz then demanded Plaintiff drop off her children and come back to the property because there was "something he needed to discuss" with her.

55.    Plaintiff dropped her children off and headed back toward the property when Fintz called her cellular phone again and asked her where she was. She responded that she would be back on property in approximately ten (10) minutes. Fintz instructed her to meet him in the lobby.

10

56.    When Plaintiff arrived at the property, Fintz was not in the lobby. Plaintiff then called Fintz' cellular phone to locate him and he told her that he was in room 2106 meeting with "some people" and to "come to the room, the door is opened."

57.    Plaintiff knocked on the door of room 2106 and Fintz told her to come into the room. When Plaintiff looked into the room, there appeared to be nobody there except Fintz. Plaintiff immediately became uneasy and asked Fintz about the other people he was supposedly "meeting with."

58.    Fintz told her it was just a "phone call" and told her to come in and sit down that he had to finish sending an email and then they would "talk about business." Plaintiff, feeling very uncomfortable, placed the lock latch between the door and door-jam to prevent the door from closing completely and stepped into the room.

59.    Fintz then asked Plaintiff a question about revenue and room count that had already been discussed at lunch. Plaintiff was immediately suspicious about Fintz' motives and decided to leave.

60.    Plaintiff started to leave the room when Fintz approached her and asked, "Who motivated you to cut your hair." Fintz then touched the back of Plaintiff's neck. Plaintiff asked Fintz if there was any other "business" he wanted to discuss because she had to get back to her children and husband.

61.    Fintz ignored Plaintiff and proceeded to tell her she was "beautiful" and "her face glowed." Fintz then stated that he had been so "stressed" lately about hotel revenue and that when he's stressed he likes to "read, play Sudoku or have sex."

11

62.    Plaintiff told Fintz she was leaving. Fintz then came closer to Plaintiff and stated, "we'll do lunch and much more together. Experience is with responsible people."

63.    Plaintiff was not sure what Fintz was saying but she understood by his behavior to mean that if she did not leave the room immediately that Fintz would attempt to attack or rape her.

64.    Before Plaintiff could react, Fintz leaned in to kiss Plaintiff, put his arms around her, squeezed her and would not let go. She tried to push Fintz away but he grabbed Plaintiff's breasts and put his tongue in her mouth.

65.    Fintz would not let go of Plaintiff despite her attempts to push him away when he said, "your breast feels good." Plaintiff then grabbed both of his hands, squeezed them and pushed them away.

66.    Plaintiff told Fintz, "I work for you. You're not supposed to disrespect me like this…don't ever do that again."

67.    Fintz then moved around Plaintiff to the door and tried to remove the lock latch from between the door and the door-jam to lock Plaintiff inside the room.

68.    While Plaintiff was trying to push past him to get out of the room, Fintz blocked the only exit from the room and turned around and grabbed Plaintiff again and kissed her and put his tongue back in her mouth.

69.    Plaintiff pushed him away while he attempted to stop her from leaving. Plaintiff finally pushed her way past him and walked out of the room while telling him never to touch her again.

70.    Plaintiff felt frightened, ashamed, humiliated and degraded and was devastated that her employer of approximately two and a half years would treat her with such disrespect and in such a threatening and demeaning manner.

71.    Following the incident in room 2106, Fintz called Plaintiff on her cellular phone and demanded she return to room 2106 to "make a reservation for him." Plaintiff refused despite her fear that she would be terminated from employment.

72.    On January 14, 2009, Plaintiff arrived at work and told the General Manager about the incidents with Fintz in room 2106. The General Manager did not know how to respond to the circumstances because Fintz was the owner of the property and his boss.

73.    Plaintiff requested that the General Manager attempt keep Fintz away from her and that she intended to contact Gevity HR to complain about Fintz conduct.

74.    At approximately 9:00 that morning, Fintz spotted Plaintiff and asked her to come to breakfast with him. Plaintiff declined the invitation and Fintz responded, "you are so beautiful your face is glowing. We'll have many lunches."

75.    Following Fintz' comments that morning, Plaintiff understood very clearly that Fintz' sexual harassment toward her was going to continue.

76.    Later on January 14, 2009, Plaintiff took notes at a managers' meeting attended by THG/CWR managers and Fintz. During the meeting, Fintz started making embarrassing and inappropriate comments about Plaintiff such as, "Look at Marie, isn't she great?" "isn't she wonderful?" "she's the best?"

13

77.     Plaintiff was extremely uncomfortable at the meeting sitting across from Fintz after he sexually assaulted her and feared that Fintz' conduct would escalate and she would eventually be attacked or raped.

78.     Plaintiff called Gevity HR on January 14, 2009 and left a message for representative, J. Cruz ("Cruz") about Fintz' sexual assault and harassment.

79.     On January 15, 2009, Plaintiff and Cruz were finally able to speak by phone and talked about the incidents with Fintz.

80.     Plaintiff told Cruz about Fintz conduct on January 13th and 14th and that she was afraid that Fintz would continue to sexually harass her and may even attempt to attack or rape her.

81.     Cruz responded to Plaintiff, "you would think he would have learned his lesson by now." Cruz explained to Plaintiff that she had investigated three (3) prior complaints of sexual harassment against Fintz.

82.     Cruz told Plaintiff that Gevity HR had knowledge of and conducted at least three (3) prior investigations of sexual harassment claims by hotel employees against Fintz.

83.     Cruz told Plaintiff to document what had happened with Fintz and that she would conduct an investigation into Plaintiff's allegations.

84.     Cruz scheduled a meeting with Plaintiff for January 16, 2009 but did not show up.

14

85.    Plaintiff was so distraught over what to do about the situation that she contacted Cruz by phone over the weekend of January 17th and spoke to her again about what had happened with Fintz.

86.    Cruz told Plaintiff Gevity HR could not do anything to help her despite their knowledge of three (3) prior claims of sexual harassment against Fintz and that Plaintiff's only option was to resign her employment to avoid further sexual assault and sexual harassment by Fintz.

87.    Cruz scheduled an in-person meeting with Plaintiff for the morning of January 19, 2009 but did not show up again.

88.    Knowing that Mr. Fintz stays at CWR every week for days at a time and that she would be subjected to the same sexually harassing conduct that she had already experienced, Plaintiff believed she had no choice but to resign her employment.

89.    On January 19, 2009, Plaintiff sent an email message to the CRW General Manager citing the reason for her resignation as the sexual harassment by Fintz.

90.    Several hours after Plaintiff submitted her resignation on January 19, 2009, Cruz met with Plaintiff in person to interview her as part of the investigation of her claims.

91.    Any reasonable person in Plaintiff's position would have felt compelled to resign her employment under the circumstances.

92.    Plaintiff has experienced and continues to suffer with debilitating mental anguish and emotional distress as a result of Fintz' conduct toward her.

## COUNT I – SEXUAL HARASSMENT

### (Violation of Title VII and the Florida Civil Right Act against all Corporate Defendants)

93.     Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 92 above as if fully set forth herein.

94.     Plaintiff is a female and a former employee of Defendants.

95.     During her employment with Defendants, Plaintiff was subjected to sexual harassment in violation of Title VII and the FCRA by the owner and operator of Triangle, Atlantic and Mazel, Marcos Fintz.

96.     Plaintiff was subjected to unwelcome conduct of a sexual nature including inappropriate sexual comments, sexual advances, sexual touching and sexual assault as described in paragraphs thirty eight (38) through ninety one (87) above and based upon her sex.

97.     The sexual harassment Plaintiff suffered was so hostile, intimidating, severe and pervasive that it altered the terms and conditions of Plaintiff's employment with Defendants.

98.     Plaintiff reported the sexual harassment to Gevity HR, as instructed by the employee handbook, and cooperated in the investigation of her claims.

99.     Gevity HR advised Plaintiff that nothing could be done to remedy the sexual harassment and suggested she resign her employment with Defendants.

100.    Gevity HR had knowledge of and investigated three (3) prior complaints of sexual harassment against Fintz.

101.    Gevity knew or had reason to believe that the sexually harassing conduct of Fintz would cause harm to Plaintiff but failed to take remedial action to correct the sexually harassing conduct.

102.    Based on Defendants' conduct, Plaintiff's only option to avoid further harm was to resign her employment with Defendants.

103.    Any reasonable person in Plaintiff's position would have felt compelled to resign based on the circumstances.

104.    Defendants have violated 42 U.S.C. §2000e-3[a] of the Civil Rights Act of 1964, as amended, and the Florida Civil Rights Act, Chapter 760.10, *et. seq.* by subjecting Plaintiff to unlawful sexual harassment and for forcing her to resign her employment.

105.    Plaintiff has suffered damages as a result of the sexual harassment and Defendants' failure to remedy the situation.

106.    As a direct and proximate cause of Defendants' illegal conduct Plaintiff has and will continue to suffer damages, including emotional distress and mental anguish, as specifically set forth herein.

WHEREFORE, Plaintiff prays for relief as follows:

a.  An award of damages according to proof including back wages, compensatory and punitive damages pursuant to Title VII and the Florida Civil Rights Act to be paid by Defendants;

b.  Costs of action incurred herein, including expert fees;

c.  An award of reasonable Attorneys' fees;

17

    d.  Pre-Judgment and Post-Judgment interest, as provided by law; and

    e.  Such other legal and equitable relief as this Court deems necessary, just, and proper.

## COUNT II – BATTERY
### (Against Triangle, Atlantic, Mazel and Fintz)

107.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 92 above as if fully set forth herein.

108.    At all times relevant to the subject matter of this action, Defendant Fintz, was the owner and operator of Defendant Triangle, Defendant Atlantic and Defendant Mazel.

109.    Defendant Fintz had the apparent and real authority over the terms and conditions of Plaintiff's employment to the extent that he was acting as an agent of Triangle, Atlantic and Mazel or was the "alter-ego" of Triangle, Atlantic and Mazel in his actions toward Plaintiff.

110.    Defendant Fintz was acting to further the interest of his businesses by making harmful and offensive physical contact with Plaintiff.

111.    Fintz battered Plaintiff by numerous harmful and/or offensive physical contacts with Plaintiff on January 13, 2009 in the scope of his authority and under color of his authority as the owner of Triangle, Atlantic and Mazel.

112.    The harmful and offensive physical contact by Fintz toward Plaintiff included caressing her leg, hugging her, kissing her, forcing his tongue in her mouth,

touching her breasts, groping her, and physically restraining her with his arms and placing his hands all over her body.

113.    As a direct and proximate result of the aforementioned harmful and offensive physical contact by Fintz, Plaintiff has suffered and will continue to suffer damages including, but not limited to, emotional distress and mental anguish.

114.    As a direct and proximate result of Defendant Fintz' harmful and offensive physical contact toward her, Plaintiff has suffered and continues to suffer from severe depression, anxiety, loss of enjoyment of life, sleep loss, and other physical symptoms of emotional trauma.

WHEREFORE, Plaintiff prays for relief as follows:

   a.  An award of damages, according to proof, including compensatory and punitive damages, to be paid by Defendants;

   b.  Costs of action incurred herein, including expert fees;

   c.  Attorneys' fees, and costs of this action;

   d.  Pre-Judgment and Post-Judgment interest, as provided by law; and

   e.  Such other legal and equitable relief as this Court deems necessary, just, and proper.

### COUNT III – FALSE IMPRISONMENT
**(Against Triangle, Atlantic and Fintz)**

115.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 92 above as if fully set forth herein.

19

116. At all times relevant to the subject matter of this action, Defendant Fintz, was the owner and operator of Defendant Triangle, Defendant Atlantic and Defendant Mazel.

117. Defendant Fintz had the apparent and real authority over the terms and conditions of Plaintiff's employment to the extent that he was acting as an agent of Triangle, Atlantic and Mazel or was the "alter-ego" of Triangle, Atlantic and Mazel in his actions toward Plaintiff.

118. Defendant Fintz intentionally and recklessly lured Plaintiff to a room in the hotel that he owned under the guise of "work related issues."

119. Once Plaintiff was in the hotel room, Defendant Fintz blocked her exit from the hotel room and refused to permit her to leave in order to sexually assault her and restrain her against her will.

120. Plaintiff had no reasonable means to exit the room because Defendant Fintz blocked her exit and further attempted to lock the door while he intentionally trapped Plaintiff in the hotel room and deprive her of her liberty while sexually assaulting her.

121. Plaintiff suffered damages as a result of Defendant Fintz' false imprisonment, including, but not limited to emotional distress and mental anguish, severe depression, loss of enjoyment of life, sleep deprivation and other severe emotional trauma.

WHEREFORE, Plaintiff prays for relief as follows:

a. An award of damages, according to proof, including compensatory and punitive damages, to be paid by Defendants;

b. Costs of action incurred herein, including expert fees;

c. Attorneys' fees, and costs of this action;

d. Pre-Judgment and Post-Judgment interest, as provided by law; and

e. Such other legal and equitable relief as this Court deems necessary, just, and proper.

## COUNT IV– INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Triangle, Atlantic, Mazel and Fintz)

122. Plaintiff re-alleges and incorporates by reference each and every allegations set forth in paragraphs 1 through 92 above as if fully set forth herein.

123. During Plaintiff's employment with Defendants, Fintz intentionally and maliciously, without justification or provocation, intimidated, harassed, assaulted and battered Plaintiff.

124. During Plaintiff's employment with Defendants, Fintz without reason or provocation made lewd and suggestive comments toward Plaintiff, intentionally lured Plaintiff to a room at the hotel property he owned and operated, and in which Plaintiff worked, under the guise of "work related issues" to sexually assault and abuse her.

125. Defendant Fintz used his authority to coerce Plaintiff into a hotel room and then physically assaulted, battered and abused her knowing she was an employee of his business and would fear the loss of her livelihood.

21

126.    Defendant Fintz acted with reckless disregard toward Plaintiff and with the specific intent to cause her mental anguish and emotional distress.

127.    Defendant Fintz intentional actions against Plaintiff have and continue to cause her damages in the form of mental anguish and emotional distress that have and continue to result in physical symptoms including, but not limited to, severe depression, anxiety attacks and sleep deprivation.

WHEREFORE, Plaintiff prays for relief as follows:

a.  An award of damages, according to proof, including compensatory and punitive damages, to be paid by Defendants;

b.  Costs of action incurred herein, including expert fees;

c.  Attorneys' fees, and costs of this action;

d.  Pre-Judgment and Post-Judgment interest, as provided by law; and

e.  Such other legal and equitable relief as this Court deems necessary, just, and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to jury trial.

Dated this 29th day of July, 2009.

Respectfully submitted,

Deborah E. Frimmel

Florida Bar No. 93970

FRIMMEL LAW GROUP, P.A.
7380 Sand Lake Road, Suite 500
Orlando, Florida 32819
Telephone:    (407) 574-4949
Facsimile     (407) 386-6300
E-Mail: Deborah@frimmellaw.com
COUNSEL for Plaintiff